## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| CHESLEY MOON, Derivatively on Behalf of Nominal Defendant PAYCOM SOFTWARE, INC., <br><br> Plaintiff, <br><br> v. <br><br> CHAD RICHISON, HENRY C. DUQUES, ROBERT J. LEVENSON, FREDERICK C. PETERS II, SHAREN J. TURNEY, J.C. WATTS, JR., FELICIA WILLIAMS, and JASON D. CLARK, <br><br> Defendants, <br><br> and <br><br> PAYCOM SOFTWARE, INC., <br><br> Nominal Defendant. | Case No. _____ <br><br> **JURY TRIAL DEMANDED** |

### <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Chesley Moon ("Plaintiff"), by and through her undersigned attorneys, brings this verified stockholder derivative action on behalf of nominal defendant Paycom Software, Inc. ("Paycom" or the "Company"), against certain of the Company's executive officers and its Board of Directors (the "Board") for breaches of fiduciary duties and violations of federal law by the Individual Defendants (defined below).  Plaintiff's allegations are based on personal knowledge as to herself and her own acts, and upon information and belief as to all other matters, based on*, inter alia*: the investigation conducted by her counsel, including review of publicly available information regarding the Company; the allegations of an amended class action complaint filed in the securities class action captioned *Caloto v. Paycom Software, Inc., et al.*, Case No. 1:23-cv-11086 (W.D. Okla. 2023) (the "Securities Class Action"); conference call

transcripts and announcements; filings with the United States Securities and Exchange Commission (the "SEC"); press releases disseminated by Paycom; legal filings; news reports; and securities analysts' reports about the Company.

## NATURE OF THE ACTION

1.      This shareholder derivative action is brought on behalf of Paycom against certain officers and members of the Company's Board for breaches of their fiduciary duties between at least February 9, 2022 and October 31, 2023, inclusive (the "Relevant Period"), and for violations of the federal securities laws caused by the issuance of materially false and misleading statements issued, or caused to be issued, by the Individual Defendants in the Company's SEC filings and other public statements. The Individual Defendants' wrongdoing has exposed the Company to massive potential liability to the class, as well as the significant defense costs in the Securities Class Action, as set forth below.

2.      Paycom is a technology company that offers businesses cloud-based human capital management ("HCM") software solutions to automate and streamline various HR and payroll processes. The Company's platform provides a range of services including payroll processing, time and attendance tracking, talent acquisition and management, and HR analytics.

3.      In July 2021, Paycom introduced a new application to streamline the payroll process called "Beti," or Better Employee Transaction Interface. Beti allows employees to process their own payrolls, reducing errors and inefficiencies.

4.      The Company failed to disclose, however, that customer adoption of Beti was threatening Paycom's future revenues, as the Company had come to rely on fees that it charged its payroll customers to fix issues in their payroll processes.

5.     As the Individual Defendants concealed the extent to which the Company's growth was dependent on the very errors and inefficiencies its Beti application was designed to address, the price of Paycom stock remained artificially inflated throughout the Relevant Period.

6.     The truth emerged on October 31, 2023, in connection with the Company's reporting of underwhelming financial results for the third quarter of 2023. The Company's third quarter revenue was below guidance, and it revised its revenue and EBITDA guidance for the fiscal year 2023 downward.  Paycom further announced that it expected the stagnating growth rates to continue into 2024 and affirmed that the poor financial results were a result of increased customer adoption of Beti.

7.     On this news, the price of Paycom common stock declined a staggering 38.5% in just one day, closing at $150.37 per share on November 1, 2023.

8.     As a result of the foregoing, the Securities Class Action was filed on December 21, 2023 against the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO"), exposing the Company to massive class-wide liability.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b) and 78t(a)).

10.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

11.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

12.     In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

13.     Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. §1391(b)(1), as Paycom is incorporated in this District and a substantial portion of the acts and omissions alleged herein, including the issuance and dissemination of materially false and misleading information, occurred in this District.

## PARTIES

*Plaintiff*

14.     Plaintiff is, and has been at all relevant times, a shareholder of Paycom.

*Nominal Defendant*

15.     Nominal Defendant Paycom is incorporated under the laws of the State of Delaware.

16.     The Company's principal executive offices are located at 7501 W. Memorial Road, Oklahoma City, Oklahoma 73142.  Paycom's common stock trades on the NYSE under the ticker symbol "PAYC."

*Individual Defendants*

17.     Defendant Chad Richison ("Richison") has served as Founder, President, CEO and a member of the Board of Paycom since 1998. Defendant Richison has also served as Chairman of the Board since August 2016. According to the Company's public filings, Defendant Richison received $211,131,206 in 2020, $2,958,410 in 2021, and $3,138,418 in 2022 in compensation from the Company. As of March 15, 2023, Defendant Richison beneficially owned 8,395,240 shares of Paycom common stock, worth more than $2.2 billion and constituting 13.9% of the total voting

power in the Company.[1]

18.    Defendant Henry C. Duques ("Duques") has served as a member of the Board since November 2016 and serves as a member of the Audit Committee and the Compensation Committee. According to the Company's public filings, Defendant Duques received $314,809 in 2022 in compensation from the Company.

19.    Defendant Robert J. Levenson ("Levenson") has served as a member of the Board since July 2007 and serves as a member of the Audit Committee and the Compensation Committee. According to the Company's public filings, Defendant Levenson received $317,809 in 2022 in compensation from the Company.

20.    Defendant Frederick C. Peters II ("Peters") has served as a member of the Board since March 2014 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Peters received $357,809 in 2022 in compensation from the Company.

21.    Defendant Sharen J. Turney ("Turney") has served as a member of the Board since September 2021 and serves as a member of the Compensation Committee and the Nominating and Corporate Governance Committee. According to the Company's public filings, Defendant Turney received $312,809 in 2022 in compensation from the Company.

22.    Defendant J.C. Watts, Jr. ("Watts") has served as a member of the Board since November 2016 and serves as Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the Company's public filings, Defendant Watts received $317,809 in 2022 in compensation from the Company.

---

[1] Valuations of the Individual Defendants' holdings of Company stock are based on the $271.72 per share closing price of Paycom's stock on March 15, 2023.

23.     Defendant Felicia Williams ("Williams") has served as a member of the Board since May 2022 and serves as Chair of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. According to the Company's public filings, Defendant Williams received $211,162 in 2022 in compensation from the Company.

24.     Defendant Jason D. Clark ("Clark") served as a member from August 2014 until December 4, 2023, at which point he was appointed to serve as Chief Administrative Officer of the Company. During the Relevant Period, Defendant Clark served as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. According to the Company's public filings, Defendant Clark received $319,809 in 2022 in compensation from the Company.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

25.     Because of their positions as officers and/or directors of Paycom, and their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Paycom and its shareholders fiduciary obligations of good faith, loyalty, trust, and candor and were required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner at all relevant times.

26.     Therefore, the Individual Defendants were required to act in furtherance of the best interests of Paycom and its shareholders.

27.     Each director and officer of the Company owes to Paycom and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

28.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Paycom, were able to and did, directly and/or indirectly, exercise

control over the wrongful acts complained of herein.

29.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of trust, loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Paycom, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

30.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, earnings, internal controls, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the launch of the Company's Beti application and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

31.     To discharge their duties, the officers and directors of Paycom were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal

controls of the Company.  By virtue of such duties, the officers and directors of Paycom were required to, among other things:

(a)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Paycom's own Code of Ethics and Business Conduct;

(b)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(c)     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion;

(d)     Remain informed as to how Paycom conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(e)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of Paycom and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(f)     Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Paycom's operations would comply with all applicable laws and Paycom's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(g)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(h)     Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)     When put on notice of problems with the Company's business practices, operations, or internal controls, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

32.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Paycom.

33.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Paycom and were at all times acting within the course and scope of such agency.

34.     Each of the Individual Defendants breached his or her fiduciary duties as alleged herein, both individually and in concert with the other Defendants.

## PAYCOM'S CODE OF ETHICS AND BUSINESS CONDUCT

35.     Paycom's Code of Ethics and Business Conduct (the "Code of Conduct") begins with a commitment to "honesty, just management, fairness, providing a safe and healthy environment and respecting the dignity due everyone. For the communities in which we live and work, we are committed to observe sound business practices and to act as concerned and responsible neighbors, reflecting all aspects of good citizenship."

36.     The Code of Conduct applies to "officers, members of the boards of directors ('**Board Members**') and employees of Paycom Software, Inc. ('**Paycom Software**') and its subsidiaries (collectively, the '**Company**')" (emphasis in original) and violations of the Code of Conduct may result in disciplinary action, including "counseling, oral or written reprimands, warnings, probation or suspension with pay, probation or suspension without pay, demotions, 8 reductions in salary, termination of employment and restitution. Violations may also result in civil or criminal actions against the violator."[2]

37.     In a section titled "**Promote a Positive and Safe Work Environment**," the Code of Conduct states, in relevant part:

> Providing an environment that supports honesty, integrity, respect, trust, responsibilities and citizenship permits us the opportunity to achieve excellence in our workplace. While everyone who works for the Company must contribute to the creation and maintenance of such an environment, our executives and management personnel assume special responsibility for fostering a work environment that will bring out the best in all of us.

38.     In a section titled "**Keep and Retain Accurate and Complete Records**," the Code of Conduct states, in relevant part:

> We must maintain accurate and complete Company records. Transactions between the Company and outside individuals and organizations must be promptly and accurately entered into our books in accordance with generally accepted accounting practices and principles, government requirements, and the Company's system of internal controls. In addition, any Company filings with regulatory authorities must be accurate, understandable and prepared in a timely manner. No one should rationalize or even consider misrepresenting facts or falsifying records. It will not be tolerated and will result in disciplinary action.

39.     In a section titled "**Obey the Law**," the Code of Conduct states, in relevant part:

> Officers and employees must conduct, and Board Members must oversee, our business in accordance with all applicable laws and regulations, both in letter and in spirit, in the countries in which the Company operates as well as those where our officers, Board Members and employees travel on Company business. Compliance

---

[2] Unless indicated otherwise, all emphasis is added in this Complaint.

10

with the law does not comprise our entire ethical responsibility. Rather, it is a minimum, absolutely essential condition for performance of our duties.

## **PAYCOM'S AUDIT COMMITTEE CHARTER**

40.     Paycom's Audit Committee Charter states that the purpose of the Audit Committee

is to assist the Board in its oversight of:

(i)     the integrity of the Company's financial statements and disclosures,
(ii)    the Company's compliance with legal and regulatory requirements,
(iii)   the qualifications and independence of the Company's Independent Auditor (as defined below),
(iv)    the performance of the Company's internal audit function and Independent Auditor and
(v)     the Company's internal control systems.

41.     In a subsection titled "Scope of Review," the Audit Committee Charter states:

In reviewing the Company's Quarterly Reports on Form 10-Q and Annual Reports on Form 10- K, the Committee shall review with management and the Independent Auditor:

▪ The certifications required to be made by management in relation to the filings, including regarding any significant deficiencies or weaknesses in the design or operation of the Company's internal control over financial reporting and any fraud, whether or not material, involving management or other employees who have a role in the Company's system of internal control;
▪ Major issues regarding the presentation of, and the clarity of the disclosure in, the Company's financial statements;
▪ Major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies
▪ Major issues regarding the Company's accounting principles and financial statement presentations, including (i) significant changes in the Company's selection or application of its accounting principles, (ii) material questions of choice with respect to the appropriate accounting principles and practices used and to be used in the preparation of the Company's financial statements, including judgments about the quality, not just acceptability, of accounting principles and (iii) the reasonableness of those significant judgments.

42.     In a section titled "*Earnings Releases and Guidance,"* the Audit Committee Charter states: "The Committee or the Chairperson shall review and discuss with management and the Independent Auditor each of the Company's earnings releases prior to its issuance."

43.     In a section titled *"Compliance, Internal Controls & Risk Management,"* the Audit Committee Charter tasks the Audit Committee with the following responsibilities:

5.15    Risk Assessment and Risk Management

The Committee shall discuss guidelines and policies to govern the process by which risk assessment and risk management is undertaken by management. The Committee shall discuss the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

5.16    Internal Controls and Compliance Policies

The Committee shall periodically review and assess with management and the Independent Auditor the adequacy of the Company's internal control systems, the Company's policies on compliance with laws and regulations and the methods and procedures for monitoring compliance with such policies, and shall recommend improvements of such controls, policies, methods and procedures.

## SUBSTANTIVE ALLEGATIONS

*Background*

44.     Paycom is a technology company that offers businesses cloud-based HCM software solutions to automate and streamline various HR and payroll processes. The Company's platform provides a range of services including payroll processing, time and attendance tracking, talent acquisition and management, and HR analytics.

45.     In July 2021, Paycom introduced a new application for payroll processing called "Beti," or Better Employee Transaction Interface. In a press release issued by the Company on July 6, 2021, Paycom stated that Beti "further automates and streamlines the payroll process by empowering employees to do their own payroll, increasing efficiencies and reducing errors . . . [e]mployees already manage all other components of their paychecks, including timecards,

expenses, PTO requests and benefits; now they have the convenience within Paycom to process their own payroll, too." The press release continued: "Beti puts the payroll responsibility into the hands of employees, eliminating what used to be a multistep, imperfect and time-consuming process for HR and payroll staff members." What the Company failed to disclose at the time was that its existing revenue streams were heavily dependent upon those very inefficiencies and errors that Beti purported to address. Specifically, Paycom earned fees for additional payroll runs when errors were made in payroll departments. Accordingly, the rollout of Beti would ultimately lead to the cannibalization of the Company's own revenues and profit margins.

***Materially False and Misleading Statements***

46.     On February 8, 2022, the first day of the Relevant Period, the Company issued a press release and held an investor call announcing its fourth quarter and full year financial results for the fiscal period ended December 31, 2021, the first fiscal year after the rollout of Beti (the "FY21 Release" and "FY21 Investor Call"). The FY21 Release reported fourth quarter 2021 "[r]evenues of $285.0 million," representing a "29.0% [increase] year-over-year," along with "GAAP net income of $48.7 million." The FY21 Release further quoted Defendant Richison, touting the Company's "very strong results in 2021, reflecting outstanding execution and robust demand for Paycom's differentiated solution," and highlighting that its "employee usage strategy, where employees are now able to do their own payroll with Beti™, ***helped deliver record annual revenue retention***," adding that "[c]ombining this with the momentum we are seeing and the sales and marketing investments we've made, we believe ***we are set up to deliver strong, high-margin revenue growth for years to come.***"

47.     The FY21 Release additionally provided financial guidance for the first quarter of 2022, reporting "[t]otal [r]evenues in the range of $342 million to $344 million" and "[a]djusted

EBITDA in the range of $161 million to $163 million." For the fiscal year 2022, Paycom reported

expected "[t]otal [r]evenues in the range of $1.314 billion to $1.316 billion" and "[a]djusted

EBITDA in the range of $524 million to $526 million."

48.     During the FY21 Investor Call, Defendant Richison opened by stating: "2021 was

a very strong year for Paycom," highlighting that the Company had "extended [its] platform to the

employee even further through innovations like BETI." In response to a question regarding Beti

adoption, Defendant Richison stated: "all new business that we've brought on since July of last

year all have BETI included in its pricing and usage expectation," while failing to disclose that, as

Paycom's customers increasingly adopted Beti, the Company would forego revenue streams from

those customers on which it had previously relied. Defendant Richison continued:

> I still feel strongly about what I said in the past. I mean BETI, ensures perfect
> payrolls. It ensures you're not going to have manual checks. You're not going to
> have voids. You're not going to have employees with overdrafts and everything
> else. **So we continue to have a lot of success deploying BETI**, and I still expect
> that all of our clients will be using BETI at some point.

49.     On May 3, 2022, the Company issued a press release and held an investor call

announcing its financial results for the first quarter of 2022 (the "1Q22 Release" and "1Q22

Investor Call"). In addition to reporting "[r]evenues of $354 million, up 30% from the comparable

prior year period," and "GAAP [n]et [i]ncome of $92 million," the 1Q22 Release quoted

Defendant Richison, stating that the Company had "opened the year with excellent results and

strong sales momentum, which has me even more confident in our strategy," and noting that

[e]mployee usage continues to drive our very strong revenue growth."

50.     The 1Q22 Release additionally provided financial guidance for the second quarter

of 2022, projecting: "[t]otal [r]evenues in the range of $308 million to $310 million" and

"[a]djusted EBITDA in the range of $111 million to $113 million." For the fiscal year 2022,

Paycom revised its earlier guidance upward, projecting: "[t]otal [r]evenues in the range of $1.333 billion to $1.335 billion" and "[a]djusted EBITDA in the range of $533 million to $535 million."

51.     During the 1Q22 Investor Call, Defendant Richison again touted the purportedly successful launch of Beti, stating that: "[i]ncreasing employee usage is a key component of the ROI that our clients realize and we believe our employee usage strategy is a competitive advantage and a driver of our very strong growth," add adding that "[a]lready well over 1/4 of our clients have implemented and/or in the process of implementing BETI."

52.     Also during the 1Q22 Investor Call, Defendant Richison was specifically asked about the impact Beti adoption was having on Paycom's revenues:

> [Mark Steven Marcon Robert W. Baird & Co. Incorporated, Research Division – Senior Research Analyst:] Congratulations on the excellent results. Wondering, can you talk a little bit about the BETI conversions that you've had so far? ***And what sort of revenue uplift you've seen***? And then what is – what's been the change in terms of the level of client engagement and satisfaction and early reads in terms of retention trends among those clients?

> [Richison:] Yes. I mean, well, from a rolling out BETI, we started doing that in July for all new clients. All quotes – for all quotes given in July, those quotes all had BETI, and so it was a part of our ongoing strategy. And so the reason I'm saying that is the way a new client would approach BETI is a little bit different than the way a current client would approach BETI.

> And what I mean by that, a current client does have to go through a bit of conversion, and they're not necessarily in a conversion mode the way a new client, they're already in a conversion mode. And so there's a little bit difference there in how we work with one or the other, but we're also getting a lot better at deploying, making those conversions and helping the client set up their data sets that they have to feed into BETI in order to make it work for them payroll after payroll.

> And so in answer to your question from a retention, absolutely, the more of a product business is used in our case, the more products that they use, the longer they stay and the happier that they are. So we're having a lot of success getting BETI out there.

> [Mark Steven Marcon Robert W. Baird & Co. Incorporated, Research Division – Senior Research Analyst:] Chad, ***do you get a revenue lift on the clients that you are converting to BETI***? And if so . . . .

[Richison:] *We do. Yes. BETI – yes. BETI provides an incremental revenue opportunity for us*. It's a – as I said in the past, it's a nominal fee. It's 1 of 29 modules, *but we do get a revenue uplift each time we sell BETI to a current client*. Or if we sell BETI to a new client, their pricing includes BETI, *and so that would be a larger fee than what it would have been prior to BETI being included*.

53.     Defendant Richison further maintained that the Company was acutely aware of how customer adoption of Beti would impact its financial results:

[Mark Steven Marcon Robert W. Baird & Co. Incorporated, Research Division – Senior Research Analyst:] And so in terms of expectations, what's built into your expectations in terms of conversions among the client base that currently doesn't have BETI through the balance of the year? And then as it relates to the rate question and the float income, to what extent would you let *that incremental benefit* flow through to the operating line as opposed to investing in it?

[Richison:] Well, taking the latter first. We're always trying to invest. I mean, our first opportunity is to invest in growth. And so we're always looking to do that, but we're also very disciplined in what we do. The first question was, as far as – is BETI built into our forecast as far as what we're looking to do. I mean *it's been built into our forecast the whole time*. I've been very aggressive about the expectations about our hopes for bringing BETI in.

54.     On August 2, 2022, the Company issued a press release and held an investor call announcing its financial results for the second quarter of 2022 (the "2Q22 Release" and "2Q22 Investor Call"). In addition to reporting "[r]evenues of $317 million, up 31% from the comparable prior year period" and "[n]et [i]ncome of $57 million," the 2Q22 Release quoted Defendant Richison, again touting the Company's "very strong second quarter results further illustrat[ing] the quality of the fundamentals of [its] business."

55.     The 2Q22 Release additionally provided financial guidance for the third quarter of 2022, projecting "[t]otal [r]evenues in the range of $327 million to $329 million" and "[a]djusted EBITDA in the range of $117 million to $119 million." For the fiscal year 2022, Paycom again revised its guidance upward, projecting "[t]otal [r]evenues in the range of $1.354 billion to $1.356 billion," and "[a]djusted EBITDA in the range of $546 million to $548 million."

56.     During the 2Q22 Investor Call, Defendant Richison reiterated that the purportedly successful launch of Beti would drive "high-margin revenue growth for years to come": "[A]lready over 13,000 clients or nearly 40% of our client base have embraced BETI . . . [t]hat's great progress . . . [w]ith only 5% share of a growing TAM, we have a long runway for continued high-margin revenue growth for years to come." Defendant Richison continued: "Our differentiated solutions and go-to-market strategy, particularly with BETI, are working well in driving new client growth and higher revenue per client."

57.     During the Q&A portion of the 2Q22 Investor Call, Defendant Richison again lauded the positive impacts of Beti adoption on Paycom's financial results:

> [Alexander Kim Mizuho Securities USA LLC, Research Division – Research Analyst:] . . . I had a question about BETI. You talked about 10,000 clients uptaking BETI in Q1 and this quarter, you have about 13,000 clients. What drove the 3Q net adds? And what sort of per employee per module uptake is part of BETI? And what kind of **growth upside** do you see from BETI adoption? Like can you answer that? And I have a follow-up.
>
> [Richison:] Yes. . . . [A]s a reminder, since July of last year, every new client that's come on our system has deployed BETI. . . .
>
> And then as far as the opportunity, that upselling into our client base has with BETI, it is **incremental increase in revenue opportunity** for us, **so it's accretive to that profile**. But in every year, we have different focuses on modules, so – and this year, and I'm sure in the next year, we're going to continue to be focusing on upselling BETI to 100% of our client base.
>
> And **again, it'll be positive**.
>
> *  *  *
>
> [Kevin Damien McVeigh Crédit Suisse AG, Research Division – MD:] Great. **Is** there **any way to frame what the revenue impact is if you were – if BETI was adopted 100% across your existing client base**. So said another way, **what's the revenue impact as BETI becomes 100% utilized across the client base**.
>
> [Richison:] Well, BETI is 1 of 29 modules that we have. **So I mean it would definitely have an impact**. Again, where we're making the impacts new business logo adds, and BETI gives us the opportunity to do that. **I think BETI will have**

***some impact for sure because we're charging for it***. But I think where you'll see a better impact to BETI once we have every single client on, I mean I think it's going to impact retention.

58.     On November 1, 2022, the Company issued a press release and held an investor call announcing its financial results for the third quarter of 2022 (the "3Q22 Release" and "3Q22 Investor Call"). In addition to reporting "[r]evenues of $334 million, up 30% from the comparable prior year period" and "[n]et [i]ncome of $52 million," the 3Q22 Release quoted Defendant Richison, again attributing Paycom's purportedly "very strong results" to "outstanding execution and robust demand for self-service, user-friendly solutions in payroll and human capital management."

59.     The 3Q22 Release additionally provided financial guidance for the fourth quarter of 2022, projecting: "[t]otal [r]evenues in the range of $366 million to $368 million" and "[a]djusted EBITDA in the range of $144 million to $146 million." For the fiscal year 2022, Paycom again revised its guidance upward, projecting "[t]otal [r]evenues in the range of $1.371 billion to $1.373 billion," and "[a]djusted EBITDA in the range of $560 million to $562 million."

60.     During the 3Q22 Investor Call, Defendant Richison stated that the Company had "delivered another very strong quarter with a focus on high-quality revenue growth that produces world-class margins," and highlighted the fact that Beti had been adopted by "nearly half of" Paycom's payroll customers.

61.     On February 7, 2023, the Company issued a press release and held an investor call announcing its fourth quarter and full year financial results for the fiscal period ended December 31, 2022 (the "FY22 Release" and "FY22 Investor Call"). In addition to reporting fourth quarter "[r]evenues of $371 million, up 30% year-over-year," along with "GAAP [n]et [i]ncome [of] $80.0 million," the release quoted Defendant Richison as again touting the Company's "outstanding

results in 2022, with accelerating revenue growth and strong margins."

62.    The FY22 Release additionally provided financial guidance for the first quarter of 2023, projecting "[t]otal [r]evenues in the range of $443 million to $445 million" and "[a]djusted EBITDA in the range of $210 million to $212 million." For the fiscal year 2023, the 3Q22 Release provided expected "[t]otal [r]evenues in the range of $1.700 billion to $1.702 billion" and "[a]djusted EBITDA in the range of $700 million to $702 million."

63.    During the FY22 Investor Call, Defendant Richison stated that the Company had "ended 2022 with very strong results" and maintained "high-level expectations for 2023." Later during the FY22 Investor Call, Defendant Richison attributed the Company's increased EBITDA to "BETI clients generat[ing] *higher-quality revenue.*"

64.    On February 16, 2023, Paycom filed its annual report for the fiscal year 2022 on Form 10-K with the SEC, signed by Defendants Richison, Clark, Duques, Levenson, Peters, Turney, Watts, and Williams (the "2022 Form 10-K"). The 2022 Form 10-K highlighted the Beti launch as a significant factor driving the Company's revenue growth:

> Client adoption of new applications and client employee usage of both new and existing applications have been significant factors in our revenue growth, and we expect the continuation of this trajectory will depend, in part, on the introduction of applications to our existing client base that encourage and promote more employee usage. For example, in 2021, we launched our industry-first Beti technology, which further automates and streamlines the payroll process by empowering employees to do their own payroll.

65.    On March 17, 2023, the Company issued its 2023 Proxy Statement, soliciting shareholder approval for a number of proposals, including the reelection of Defendants Turney and Watts to the Board, which contained a letter from Defendant Richison again highlighting Paycom's "outstanding results in 2022, with *accelerating revenue growth and robust margins.*"

66.    On May 2, 2023, the Company issued a press release and held an investor call announcing its financial results for the first quarter of 2023 (the "1Q23 Release" and "1Q23

Investor Call"). In addition to reporting "[r]evenues of $452 million, up 28% from the comparable prior year period," and "GAAP [n]et [i]ncome of $119 million," the 1Q23 Release quoted Defendant Richison, stating that "[r]esults for the first quarter of 2023 were excellent, with robust revenue growth from new clients and expanding margins."

67.     The 1Q23 Release additionally provided financial guidance for the second quarter of 2023, projecting "[t]otal [r]evenues in the range of $397 million to $399 million" and "[a]djusted EBITDA in the range of $152 million to $154 million." For the fiscal year 2023, Paycom provided expected "[t]otal [r]evenues in the range of $1.713 billion to $1.715 billion," and "[a]djusted EBITDA in the range of $717 million to $719 million."

68.     During the 1Q23 Investor Call, Defendant Richison lauded Paycom's "strong recurring revenue growth from new clients." Also during the call, in response to a question about how sales of Beti impact the Company's free cash flow, Defendant Richison claimed that increased Beti adoption benefitted Paycom's margins: "[O]n the margin, they require less service for us to be able to provide them and less services around what I would call more of our low-margin activities, which is going to be amending – amended returns and other issues that could come out by having payroll done wrong."

69.     On August 1, 2023, the Company issued a press release and held an investor call announcing its financial results for the second quarter of 2023 (the "2Q23 Release" and "2Q23 Investor Call"). In addition to reporting "[r]evenues of $401 million, up 27% from the comparable prior year period" and "[n]et [i]ncome of $65 million," the 2Q23 Release quoted Defendant Richison, touting "another strong quarter, which was highlighted by ***strong revenue growth and margin expansion,"*** despite the fact that Paycom's gross margin had actually declined from 84.2% in the second quarter to 83.2% in the third quarter of 2023.

70.     The 2Q23 Release additionally provided financial guidance for the third quarter of 2023, projecting "[t]otal [r]evenues in the range of $410 million to $412 million" and "[a]djusted EBITDA in the range of $156 million to $158 million." For the fiscal year 2023, Paycom revised its guidance upward, projecting "[t]otal [r]evenues in the range of $1.715 billion to $1.717 billion" and "[a]djusted EBITDA in the range of $722 million to $724 million."

71.     As the projected range of $410 million to $412 million for third quarter 2023 revenue guidance was slightly below market expectations of $412 million—market expectations that were based on the Individual Defendants' positive and misleading statements during the Relevant Period—and because third quarter adjusted gross margins had contracted 100 basis points on a year-over-year basis, the price of Paycom common stock declined sharply in response to the news. When trading resumed on August 2, 2023, the price of Paycom common stock had declined nearly 20% in one day, closing at $298.59 per share. However, as the Individual Defendants failed to disclose the reason for its reduced revenue guidance and margins, the price of Paycom stock remained artificially inflated.

72.     The statements identified in ¶¶ 46-71 above were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) Paycom had been relying on substantial, one-off payroll correction fees to fuel its revenue growth; (ii) increased adoption of Beti by Paycom's payroll customers was threatening the Company's future revenues and margins by reducing the demand for one-off payroll corrections; and (iii) as a result of the foregoing, the Individual Defendants' statements about Paycom's business, operations, and prospects lacked a reasonable basis at all relevant times.

73.     The truth fully emerged on October 31, 2023, in connection with the Company's announcement of underwhelming financial results for the third quarter of 2023. Paycom reported third quarter revenues of $406 million, down from its guidance of "$410 million to $412 million." Further, the Company revised its fiscal year 2023 revenue guidance downward, from "the range of $1.715 billion to $1.717 billion" to a range of "$1.679 billion to "$1.684 billion," and rather than the "[a]djusted EBITDA in the range of $722 million to $724 million," Paycom now only expected "$712 million to $717 million." The Company affirmed that its growth rates were indeed stagnating due to Beti adoption, and management warned that revenues would only grow 15% in the fourth quarter of 2023 and in the range of 10% to 20% during fiscal year 2024, a significantly lower growth rate than experienced in the past. The Company's adjusted gross margins for the third quarter of 2023 also contracted another 20 basis points year-over-year to 83.7%, well below the continuing 84%-86% indicated on August 1, 2023, and demonstrating a downward trend:



74.     On this news, the price of Paycom common stock declined a staggering 38.5% in just one day, closing at $150.37 per share on November 1, 2023.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

75.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law.

76.     Paycom is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

77.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

78.     Plaintiff is an owner of Paycom stock and has been a continuous holder of the Company's common shares at all relevant times.

79.     At the time this action was commenced, the seven-member Board was comprised of Defendants Richison, Duques, Levenson, Peters, Turney, Watts, and Williams (the "Director Defendants"). Accordingly, Plaintiff is only required to show that four directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Board's current directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

80.     The Director Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Director Defendants

knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Director Defendants could not fairly and fully prosecute such a suit even if they instituted it.

81.     The Director Defendants either knowingly or recklessly issued or caused the Company to issue the materially false and misleading statements alleged herein. The Director Defendants knew of the falsity of the misleading statements at the time they were made. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

82.     As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Paycom, the Director Defendants knew, or should have known, the material facts surrounding the launch of the Company's Beti application.

83.     Defendant Richison is not disinterested or independent, and therefore, is incapable of considering a demand because he is named as a defendant, and faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

84.     Defendants Duques, Levenson, Peters, and Williams serve as members of the Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility of assisting the Board in fulfilling its oversight responsibilities related to internal

controls over financial reporting and public disclosure requirements. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding material deficiencies in the Company's accounting practices and the adequacy of the Company's internal controls as alleged above. Therefore, Defendants Duques, Levenson, Peters, and Williams cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

85.     Additionally, each of the directors received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company. Indeed, all of the Director Defendants benefitted directly from the wrongdoing alleged herein. Specifically, the Director Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of Paycom stock and stock options they held.

86.     The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to Paycom's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

87.     Furthermore, demand in this case is excused because each of the directors derive substantial revenue from the Company, control the company, and are indebted to each other. These conflicts of interest have precluded the current directors from adequately monitoring the Company's operations and internal controls and calling into question the other Individual Defendants' conduct. Significantly, none of the Director Defendants have taken remedial action to redress the conduct alleged herein.

88.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

89.     The acts complained of herein constitute violations of fiduciary duties owed by Paycom's officers directors, and these acts are incapable of ratification.

90.     The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds *i.e.*, monies belonging to the stockholders of Paycom. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the

Director Defendants were to sue themselves or certain officers of Paycom, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

91.     If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Paycom to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

92.     Accordingly, for all of the reasons set forth above, all of the current directors cannot consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

## COUNT I
### Against the Individual Defendants for
### Breach of Fiduciary Duties

93.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

94.     The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

95.     The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

96.     The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

97.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

98.     Plaintiff, on behalf of Paycom, has no adequate remedy at law.

### COUNT II
**Against the Individual Defendants for Aiding and
Abetting Breach of Fiduciary Duty**

99.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

100.    By encouraging and accomplishing the illegal and improper actions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated,

and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

101.    Plaintiff, on behalf of Paycom, has no adequate remedy at law.

**COUNT III**
**Against the Individual Defendants for**
**Unjust Enrichment**

102.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

103.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Paycom.

104.    The Individual Defendants were unjustly enriched by their receipt of bonuses, stock options, or similar compensation from Paycom that was tied to their performance or to the artificially inflated valuation of Paycom.

105.    Plaintiff, as a stockholder and representative of the Company, seeks restitution from the Individual Defendants, and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants as a result of their wrongful conduct and fiduciary breaches.

106.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has suffered significant damages, as alleged herein.

107.    Plaintiff, on behalf of Paycom, has no adequate remedy at law.

<u>COUNT IV</u>
**Against the Individual Defendants for Violations of § 10(b)**
**of the Exchange Act and Rule 10b-5**

108.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

109.    The Individual Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

110.    The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

111.    The Individual Defendants violated Section 10(b), of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff.

112.    The Individual Defendants acted with scienter because they: (i) knew that the public documents and statements issued or disseminated in the name of Paycom were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

113.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Paycom, their control over, and/or receipt and/or modification of the materially misleading statements alleged herein, and/or their associations with the Company which made them privy to confidential proprietary information concerning Paycom, participated in the fraudulent scheme alleged herein.

114.    As a result of the foregoing, the market price of Paycom common stock was artificially inflated during the relevant time period. In ignorance of the falsity of the statements, Plaintiff relied on the statements described above and/or the integrity of the market price of Paycom common stock in purchasing Paycom common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

115.    In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Class Action and reputational harm. The Individual Defendants, through their violation of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

116.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

117.    Plaintiff on behalf of Paycom has no adequate remedy at law.

## COUNT V
### Against the Individual Defendants for Waste of Corporate Assets

118.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

119.    The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Paycom's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

120.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things, incurring and paying defense costs in connection with the Securities Class Action, and approving performance-based compensation linked to the Company's perceived successes.

121.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

122.    Plaintiff on behalf Paycom has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their

unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: January 12, 2024

**OF COUNSEL:**

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085

**RIGRODSKY LAW, P.A.**

By: */s/ Gina M. Serra*
Seth D. Rigrodsky (#3147)
Gina M. Serra (#5387)
Herbert W. Mondros (#3308)
300 Delaware Avenue, Suite 210
Wilmington, DE 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530
Email: sdr@rl-legal.com
        gms@rl-legal.com
        hwm@rl-legal.com

*Attorneys for Plaintiff*